**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| RONALD V. MAPP and JOHN STURDIVANT, <br><br>                 *Plaintiffs*, <br><br><br> vs. <br><br><br> DUCKWALL-ALCO STORES, INC., <br><br><br><br>               *Defendant*. | Case No. 09-1304-EFM |

## MEMORANDUM AND ORDER

This case involves a claim under the Age Discrimination in Employment Act and a breach of contract claim. Plaintiffs Ronald Mapp and John Sturdivant assert that Defendant Duckwall-Alco used a "corporate reorganization" or "reduction in force" as a sham to discriminate against them on the basis of their age. Before the Court is Defendant's Motion for Summary Judgment (Doc. 36). The motion has been fully briefed. For the following reasons, the Court grants Defendant's motion.

## I. Facts and Procedural Background[1]

Duckwall-Alco is a Kansas corporation, with its headquarters in Abilene, Kansas, that operates regional retail stores in twenty-three states. In March 2005, Duckwall-Alco hired Bruce Dale, whom had been employed at Michael's Stores for ten years, as its President and Chief Executive Officer.

---

[1]In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

In 2006, Dale recruited John ("Rick") Sturdivant to Duckwall-Alco. Dale previously worked with Sturdivant at Michael's Stores, and they had a professional and personal relationship. Sturdivant was hired as Senior Vice President of Operations in February 2006, and he was sixty-one years old at the time of his hiring. Sturdivant moved from Atlanta, Georgia to Abilene, Kansas for the position. In connection with his employment with Duckwall-Alco, Sturdivant signed an Employment Agreement dated January 27, 2006. As Senior Vice-President of Operations, Sturdivant's responsibilities included all store operations and loss prevention activities and enterprise risk control.

Ronald ("Ron") Mapp also previously worked with Dale at Michael's Stores, and Dale recruited Mapp to Duckwall-Alco. In July 2007, Duckwall-Alco hired Mapp as Senior Vice President of Merchandising. Mapp relocated to Abilene, Kansas from Phoenix, Arizona to take the position.[2] Mapp was fifty-nine years old at the time of his hiring. In connection with his employment, Mapp signed an Employment Agreement dated July 23, 2007. As Senior Vice President of Merchandising, Mapp was responsible for all activities related to the procurement of merchandise for Duckwall-Alco.

As of February 21, 2008, Duckwall-Alco had an organizational structure consisting of one President/CEO and seventeen senior vice-president or vice president positions. On February 22, 2008, Bruce Dale resigned from Duckwall-Alco as its President and CEO. Dale resigned because of a conflict with Raymond French, Duckwall-Alco's largest shareholder. Both Sturdivant and Mapp reported directly to President and CEO Bruce Dale until Dale's resignation.

---

[2]The record reflects both Phoenix, Arizona and Scottsdale, Arizona as the place from which Mapp relocated. In Mapp's deposition, he speaks of Phoenix and Scottsdale. His Employment Agreement references Phoenix, yet another document references Scottsdale. Although the specific city is not material, the Court will rely on Phoenix.

Following Dale's resignation, Donny Johnson, the Senior Vice-President and Chief Financial Officer of Duckwall-Alco, assumed the role of interim President and CEO. Both Sturdivant and Mapp then reported to Johnson.

On March 1, 2008, Johnson participated in a conference call with the Board of Directors. As of March 1st, Duckwall-Alco had a seven-member Board of Directors. Following the conference call, Johnson sent an email to the five Senior Vice-Presidents, entitled "Overhead Efficiencies." In this email, Johnson advised the senior vice-presidents that they needed to review how their departments were organized and structured and to "[d]evelop a plan to implement effective savings where possible." In response to Johnson's March 1, 2008 email, Sturdivant and Mapp each prepared an organizational chart in order to reduce and eliminate some positions within their respective departments. Neither recall presenting their proposals to anyone other than Johnson, and Mapp testified that none of the proposals were acted upon.

Sturdivant and Mapp understood that as of March 2008, Johnson had received a directive from the Board of Directors to streamline the company's costs. Mapp admits that in March and April 2008, he understood the company was contemplating a reduction in force. Sturdivant admits that he understood that in February and March 2008, the company "wanted some cost reductions" and that it was the Board of Director's belief that the company was too top-heavy in senior management and too heavy on SG&A (selling, general and administrative) expenses.

On March 4, 2008, a strategic budget and planning meeting was held with the Board of Directors, Johnson, and several of the senior vice presidents and vice presidents, including Mapp and Sturdivant. Following the March 4th meeting and in an email dated March 5, 2008, Board member Royce Winsten informed Johnson that "SG&A cuts have to be deep and extensive." With

respect to the senior vice president and vice president positions, Winsten's email provided:

> Pull together your competent SVP/VPs and build from there. From the look of things yesterday it will be a small group. It's clear Mapp, Sterdivant [sic] and the advertising lady are very weak players in very important slots. Their direct reports are likely as weak as they are. As I thought about Hixon, he seemed relatively strong in the group but the bar was set very low. In any event, it would seem there will be no need for a real estate guy.

On March 7, 2008, two members of Duckwall-Alco's Board of Directors resigned, and two other individuals were appointed to the Board. The Board also elected Royce Winsten as the new Chairman of the Board.

On March 8, 2008, Johnson proposed restructuring and streamlining the 18 executive positions to 12 executive officer positions, as well as eliminating an additional 36 corporate positions comprised of both monthly salaried and hourly staff. He also proposed the reduction of 42 of the 216 corporate positions constituting approximately 22.5% of the corporate labor dollars, or $2.3 million of the $10.1 million in salary.

On March 10, 2008, Johnson advised the Board of Directors that one senior vice president (Sturdivant) and three vice presidents (Gunderson, Roth, and Van Horn) were in charge of retail operations; one senior vice president (Mapp) and two vice presidents (Gawin and Swartz) were in charge of merchandising; and one senior vice president (Hixon) was in charge of real estate and new store development. Johnson proposed that the company needed to reduce the group of eight officers to three officers. Johnson explained that, in his opinion, the company only needed one officer to handle merchandising and two officers to handle operations and real estate. He advised the Board that the proposed reduction equated to $800,000 in labor and benefit savings.

On March 13, 2008, two board members resigned, and the remaining five-member board voted to reduce its size from seven members to five.

On April 1, 2008, Sturdivant and Mapp were both scheduled to meet with Jim Hyde, a new board member, for purposes of evaluating the qualifications of the management staff. Sturdivant's and Mapp's meetings were moved to later in the day, and the individual meetings were reduced from a scheduled forty-five minutes to a meeting that lasted approximately fifteen minutes each. During the meeting with Mapp, Hyde asked him "Why aren't you the operator?" and made the remark, "Jeez, you've been around a long time."

On April 11, 2008, Duckwall-Alco terminated John Sturdivant, Ron Mapp, Mike Gawin, and Virginia Meyer. On the date of termination, Sturdivant was sixty-three years old, Mapp was sixty years old, and Meyer was sixty-four years old.[3] Sturdivant was the second highest paid member of Duckwall-Alco's management, and Mapp was the fourth highest paid member of Duckwall-Alco's management.

On April 11, 2008, Johnson came to both Sturdivant's and Mapp's offices and advised them that their employment was being terminated as a cost cutting measure and that the termination had nothing to do with their performance. Both were given a written notice of termination.

In the press release announcing the four terminations, it provided, in part, the following:

> Duckwall-ALCO Stores, Inc. (NASDAQ: DUCK) today announced the first step in a multiphase program to streamline the Company's management and operations, with the goal of improving its profitability and return on equity (ROE). These changes stem directly from a comprehensive re-evaluation of Company plans and operations initiated after the changes to the Board of Directors were announced in March of this year.

> As part of this process, the Company announced today that four members of

---

[3]Gawin was 56 years old.

corporate management have been terminated: John Sturdivant, Senior Vice President Store Operations; Ron Mapp; Senior Vice President Merchandising; Mike Gawin, Vice President and Divisional Merchandise Manager Softlines; and Virginia Meyer, Vice President Marketing. The responsibilities of these individuals will be assumed by Phil Hixon (Store Operations), Bob Swartz (Merchandising) and Brent Streit (Marketing).

"During our recent re-evaluation of plans for Fiscal 2009, we recognized that reducing corporate staff is imperative," said Donny Johnson, Interim Chief Executive Officer of Duckwall-ALCO Stores. "The changes announced today are the first step in a change process that will prove very positive for Duckwall-ALCO Stores. We are implementing a plan to cut expenses and improve operations, streamline the organization and strengthen our senior management team. An analysis of the Company's operations conducted jointly with the new Board of Directors and management has identified numerous opportunities for cutting costs and improving operations. These changes will strengthen the Company and improve profitability, with the ultimate goal of dramatically improving shareholder value."

Following Sturdivant's termination, Phillip Hixon, Senior Vice President of Real Estate and Store Development, assumed all of Sturdivant's responsibilities as Senior Vice-President of Store Operations in addition to his responsibilities for real estate and store development. Hixon called Sturdivant within two hours of the termination and told Sturdivant that he was assuming Sturdivant's responsibilities. As of April 14, 2008, Hixon was fifty-four years old.

Following Mapp's and Gawin's terminations, Robert Swartz, Vice President Divisional Merchandise Manager of Hardlines, assumed Mapp's former merchandise management duties and Gawin's former duties as Vice President Divisional Merchandise Manager of Softlines.[4] As of April 14, 2008, Swartz was fifty-one years old. On July 24, 2008, Duckwall-Alco hired Jane Gilmartin, age 53, in the new position of Executive Vice President and Chief Operating Officer.

---

[4]While Plaintiffs attempt to controvert this fact by asserting that Defendant's facts diverge as to which person took over Mapp's responsibilities, Plaintiffs assert in their facts that Mapp's responsibilities appear to have been taken over by Swartz and then by Gilmartin. The Duckwall-Alco press release provides that the responsibilities of the four terminated employees would be assumed by Hixon, Swartz, and Streit. It appears that Swartz held Mapp's responsibilities for a period of time and then Gilmartin assumed those same responsibilities after she was hired in July.

Gilmartin assumed the merchandising management duties previously held by Mapp, in addition to other responsibilities.

In May of 2008, Duckwall-Alco eliminated an additional twenty positions at its Abilene, Kansas corporate headquarters. This included eliminating the corporate officer position of Vice President of Operations in the Western District, occupied by Kalen Gunderson. Leon "Dan" Roth, Jr. assumed Gunderson's former responsibilities, in addition to his regular duties as Vice President of Operations in the Eastern Division. Roth was six years younger than Gunderson. As of May 5, 2008, Duckwall-Alco's total corporate labor cost reductions equaled an annualized savings to the company of approximately 2.5 million, representing over a 20 percent reduction of fiscal year-end total general office labor costs and over a 10 percent reduction of total general office SG&A.

On January 21, 2009, Mapp filed a Charge of Discrimination against Duckwall-Alco alleging age discrimination. On January 27, 2009, Sturdivant filed his Charge of Discrimination against the company alleging discrimination on the basis of age.

Sturdivant and Mapp filed suit on October 7, 2009 alleging discrimination on the basis of their age and breach of contract. With respect to their breach of contract claim, Plaintiffs allege that Defendant failed to pay their moving expenses pursuant to their employment agreements.

Defendant moves for summary judgment asserting that Plaintiffs cannot establish a prima facie case of age discrimination, and even if they could establish a prima facie case, they have no evidence that Defendant's legitimate reason was pretext for age discrimination. In addition, Defendant asserts that neither Plaintiff can establish a breach of contract.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[5] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[6] A fact is "material" when "it is essential to the proper disposition of the claim."[7] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[8]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[9] In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[10]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[11] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12] "To accomplish this, the

---

[5]Fed. R. Civ. P. 56(c).

[6]*Haynes v. Level 3 Communications*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006).

[7]*Id.*

[8]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[9]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23).

[10]*Id.* (citing *Celotex*, 477 U.S. at 325.)

[11]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[12]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[13] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[14]  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[15]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16]

## III.  Analysis

### A.      *Age Discrimination Claim*

Under the Age Discrimination in Employment Act ("ADEA"), a plaintiff must establish "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."[17]  A plaintiff need not demonstrate that age was the sole factor in the adverse employment decision but must instead demonstrate that "age was the factor that made a difference."[18]  The *McDonnell Douglas* burden shifting analysis is applicable to age discrimination claims, and the plaintiff carries the burden of persuasion throughout the three-step process.[19]  The burden of production, however, shifts at each step.[20]

---

[13]*Adler*, 144 F.3d at 671.

[14]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[15]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[16]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[17]*Gross v. FBL Fin. Servs., Inc.*, — U.S. —, 129 S.Ct. 2343, 2352, 174 L.Ed.2d 119 (2009).

[18]*Jones v. Oklahoma City Pub. Schools*, 617 F.3d 1273, 1277 (citing *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010)).

[19]*Id.* at 1278-79.

[20]*Id.* at 1278.

Under *McDonnell Douglas*, the plaintiff first bears the burden of establishing a prima facie case of age discrimination. If the plaintiff carries this burden, the employer must then come forward with some legitimate, non-discriminatory reason for the adverse employment action. If the employer succeeds in this showing, the burden shifts back to the plaintiff to show that the employer's proffered justification is pretextual.[21]

### 1. Prima facie case

Generally, to establish a prima facie case of discrimination under the ADEA, a plaintiff must demonstrate that "(1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person."[22] However, the fourth element of a prima facie case is flexible, and there are times when a different formulation may be needed.[23] In particular, in reduction in force cases, because an employee is not always replaced with another individual, the Tenth Circuit has modified the fourth element, and a plaintiff "may demonstrate the fourth element by producing evidence, circumstantial or direct, from which a fact-finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue."[24] A plaintiff's prima facie burden is not onerous.[25]

For purposes of summary judgment, Defendant concedes that Plaintiffs meet the first, second, and third prongs of the test. Defendant, however, asserts that Plaintiffs cannot meet the

---

[21]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008) (citation omitted).

[22]*Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) (citations omitted).

[23]*Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1166 n.8 (10th Cir. 2007)*; Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).

[24]*Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995) (citation and quotation omitted); *see also Hinds*, 523 F.3d at 1195 (setting forth the fourth element as requiring the employee to have "some evidence the employer intended to discriminate against him or her in reaching its RIF decision.").
   The Court notes that Defendant contends that Plaintiffs' terminations were the result of a corporate reorganization, or reduction in force.

[25]*Plotke*, 405 F.3d at 1099.

fourth element of a prima facie case in demonstrating a legally cognizable younger replacement because Plaintiffs' former duties were redistributed and absorbed by the remaining officers. The Court does not agree. Plaintiffs' responsibilities were not divided up and spread among several remaining individuals. Instead, all of Plaintiff Sturdivant's responsibilities were absorbed by Hixon, and all of Plaintiff Mapp's responsibilities were absorbed by Swartz and then several months later by Gilmartin. Although the individuals who assumed Plaintiffs' responsibilities still maintained their previous responsibilities, the evidence demonstrates that Plaintiffs' duties were each assumed by one person and not distributed among several individuals. Therefore, although there was not a typical "replacement" in that one individual was not hired to fill Plaintiffs' position, Plaintiffs' responsibilities were assumed by younger employees.[26]

Defendant next argues that even if Plaintiffs could prove that they were replaced by younger employees, the age difference is insignificant because the individuals who assumed Plaintiffs' responsibilities were within the protected class and were less than ten years younger than Plaintiffs. Defendant relies on a case from the Seventh Circuit,[27] in which the court found that an age disparity of less than ten years was presumptively insubstantial, unless the plaintiff directed the court to evidence that her employer considered her age to be significant.[28] Defendant contends that an inference of discrimination does not exist because Plaintiffs' replacements were less than ten years younger.

---

[26]These facts demonstrate why the fourth prong of a prima facie case is flexible. To require Plaintiffs to identify a specific younger replacement for their specific position when Defendant asserts that Plaintiffs were terminated because of a reorganization in which Defendant eliminated and consolidated positions would necessarily mean Plaintiff could not meet the prima facie case. In this case, younger individuals took over Plaintiffs' responsibilities, in addition to performing their own responsibilities.

[27]*Cianci v. Pettibone Corp.*, 152 F.3d 723 (7th Cir. 1998).

[28]*Id*. at 728.

There is no requirement that the individual replacing a plaintiff be outside the protected class.[29]  In addition, the Tenth Circuit has refused to adopt a bright line rule that a five-year age difference is insignificant.[30]  In *Whittington v. Nordam Group Inc.*, the Tenth Circuit explained that all five-year age differences may not be the same.[31]  "The replacement of a 45-year old by a 40-year old would be less suspicious than the replacement of a 62-year old by a 57-year old. Comparing a 62-year-old worker with one who is 57, an employer may think it better to retain someone who will stay with the company another eight years (until age 65) rather than one who would be retiring in three years, less than half the time."[32]

In this case, the individual who assumed Sturdivant's responsibilities was nine years younger, and the two individuals who assumed Mapp's responsibilities were nine and seven years younger.  In addition, Sturdivant was 63 years old, and Mapp was 60 years old.  The Court cannot conclude as a matter of law that the age difference is insignificant because as the Tenth Circuit noted in *Whittington*, a five-year age difference may be significant with respect to how close Plaintiffs were to the standard retirement age of 65.   As such, the Court concludes that Plaintiffs have established a prima facie case of age discrimination.

### 2. Legitimate, nondiscriminatory reason

The burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its

---

[29]*O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).

[30]*Whittington v. Nordam Group Inc.*, 429 F.3d 986 (10th Cir. 2005).

[31]*Id.* at 995-96.

[32]*Id.* at 996; *see also Oglesby v. Hy-Vee, Inc.*, 214 F. App'x 829, 833 (10th Cir. 2007) (finding that plaintiff satisfied the fourth element of a prima facie case although his replacement was only five years younger than him).

decision. This is an "exceedingly light" burden.[33]  Defendant asserts that Plaintiffs' terminations were the result of a company-wide reorganization, or reduction in force, that impacted numerous departments. Accordingly, Defendant has met its burden in articulating a legitimate, nondiscriminatory reason.

### 3. Pretext

"A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[34]  A plaintiff typically makes a showing of pretext with: (1) evidence that defendant's stated reason is false; (2) evidence that defendant acted contrary to a written policy; and (3) evidence that defendant acted contrary to an unwritten policy or practice.[35]

Plaintiffs assert that they can establish pretext evidence from four different areas. These include: (1) Plaintiffs' assertion that the reorganization was designed to replace the older members of management; (2) Plaintiffs' assertion that they were better qualified than the employees retained by Defendant; (3) Plaintiffs' assertion that their relationship with the former CEO was not a factor in their terminations; and (4) several age-related comments.

---

[33]*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007).

[34]*Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (citation and quotation omitted).

[35]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  Although both Defendant and Plaintiffs approach Plaintiffs' terminations as a reduction in force or a "reorganization," they rarely cite to reduction in force cases or discuss reduction in force principles.  The Tenth Circuit has noted that "[t]here are three common methods used to demonstrate pretext in the RIF context: (1) evidence that the termination of the employee is inconsistent with the employer's RIF criteria; (2) evidence that the employer's evaluation of the employee was falsified to cause termination; or (3) evidence that the RIF is more generally pretextual."  *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000) (quotation and citation omitted).  These methods are similar to methods in cases that do not involve a reduction in force.  In any event, at this stage, a plaintiff must present sufficient evidence that there is a question of fact as to whether the defendant discriminated on the basis of age.

*Reorganization was designed to replace the older members of management*

Plaintiffs contend that the "reorganization" or "reduction in force" was a sham and was instead Defendant's way to replace the oldest members of management. Both Sturdivant and Mapp testified that they were fired due to their age because Duckwall wanted to reorganize its management to get rid of older members. They allege that the manner in which Defendant went about analyzing its corporate structure and management for purposes of identifying ways to cut costs was not consistent with standard reduction in force procedures. However, they do not identify a "standard reduction in force procedure" nor do they demonstrate any inconsistencies in the process.[36] Accordingly, their evidence is insufficient.

Plaintiffs also argue that an examination of the ages of the individuals terminated on April 11, 2008 demonstrates that the reorganization was a sham for age discrimination. Four individuals were terminated on that date. These include: Sturdivant (age 63), Mapp (age 60), Meyer (age 64), and Gawin (age 56).[37]

Plaintiffs emphasize that the first and second oldest Senior Vice Presidents and the second oldest Vice President were terminated. However, "[d]ata showing a pattern of conduct towards a protected class must show a significant disparity in defendants' treatment of the protected class and must eliminate non-discriminatory reasons for this treatment."[38] In addition, in general, "a small

---

[36]Although Plaintiffs argue that their scheduled meetings on April 1, 2008 with new board member, Jim Hyde, were shortened from 45 minutes to 15 minutes and moved to the end of the day, Plaintiffs provide no evidence as to how this is indicative of age discrimination. Instead, they speculate about the content of Hyde's meetings with other employees with no supporting evidence. Plaintiffs' assertion that their shortened meetings indicates Defendant's continuation of a "charade" is pure speculation.

[37]Plaintiffs only focus on Sturdivant, Mapp, and Meyer, and they rarely discuss Gawin's inclusion in the termination group.

[38]*Smith v. Bd. of Cnty. Comm'rs*, 96 F. Supp. 2d 1177, 1189 (D. Kan. 2000).

statistical sample carries little or no probative force to show discrimination."[39]

Here, there were only eighteen corporate executives, and every employee was within the protected class as everyone was above the age of 40. Furthermore, Plaintiffs do not include in their discussion that a fourth individual, Gawin, was terminated on the same date as Plaintiffs.[40] Gawin was the fifth oldest Vice President which indicates that three older Vice Presidents, including the oldest Vice President, were not terminated on that date. Plaintiff's evidence is simply insufficient to demonstrate that Defendant's reorganization was a sham for age discrimination.

*Plaintiffs' qualifications*

With respect to Plaintiffs' contention that they are better qualified than the employees retained by Defendant, Defendant does not contend that Plaintiffs were unqualified. In fact, Defendant informed Plaintiffs that they were being terminated on the basis of cost-cutting and not on the basis of their performance. In any event, Plaintiffs' perception as to their qualifications is irrelevant. "It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance."[41] As such, Plaintiffs' beliefs are immaterial and are not probative of pretext.

*Plaintiffs' previous relationship with the former CEO*

Plaintiffs also contend that Defendant is trying to cover up age discrimination because it has now asserted that Plaintiffs' previous relationship with the former CEO, Bruce Dale, was a factor

---

[39]*Fallis v. Kerr-McGee Corp*, 944 F.2d 743, 746 (10th Cir. 1991).

[40]Gawin was re-hired by Defendant on May 1, 2009, approximately one year after his termination, in a different position.

[41]*Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996).

in their terminations.[42]  Defendant never mentioned this alleged factor when terminating Plaintiffs, and Defendant did not bring it up until after Plaintiffs had filed charges with the EEOC.  Plaintiffs argue that the fact that this argument has now been raised indicates that Defendant is trying to proffer as many reasons as it can to cover the fact that Plaintiffs were terminated on the basis of their age.  The Court disagrees.  The uncontroverted facts indicate that Plaintiffs were terminated when the company went through a reorganization and eliminated four positions.  Although Defendant may or may not have considered Plaintiffs' loyalties to the former CEO as a factor in their terminations, "[m]ere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment."[43]  Plaintiffs' claims are simply insufficient in demonstrating pretext.

*Age-related comments*

To establish pretext, Plaintiff must demonstrate a nexus between the comment and the adverse employment action.[44]  Plaintiffs first rely on a comment made in 2007 by Tom Canfield, another Senior Vice President, to Sturdivant.[45]  The comment was not about either Plaintiff and was approximately one year prior to Plaintiffs' terminations.  In addition, Plaintiffs have not demonstrated how it related in any way to their terminations.  Isolated comments are insufficient to

---

[42]Defendant asserts that Plaintiffs' close personal and professional ties and loyalties to Bruce Dale, were also motivating factors in Johnson's decision to terminate Plaintiffs' employment.  Plaintiff controverts these facts by asserting that they were not told that at the time they were terminated, and instead they were only told that their terminations were on the basis of cost-cutting.

[43]*Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) (citations omitted).

[44]*Stone*, 210 F.3d at 1140 (10th Cir. 2000).

[45]With respect to this comment, in 2007, Sally West was hired as a district manager.  Tom Canfield, Senior Vice President of Logistics, called Sturdivant and asked him if he knew how hold West was when she was hired.  Sturdivant reminded Canfield that it was  an improper question, and when Sturdivant told Canfield that West was 68 years old, Canfield stated that he could not believe the company hired someone sixty-eight years old.

establish pretext unless they can be tied to the disputed employment action.[46]

Plaintiffs next rely on a comment made by Jim Hyde, a new member of Defendant's board of directors, in which Hyde said to Mapp during a meeting, "Jeeze, you've been around a long time." However, when Mapp was questioned about this comment, he testified that he understood Hyde to have meant "literally" that Mapp had been employed in retail for a lot of years. The Court cannot conclude that Hyde's remark is indicative of a discriminatory intent.[47]

Finally, Plaintiffs rely on an internal memorandum that includes such statements as corporate managers being unwilling to "try new things or ideas;" moving "too slow;" a "lack of energy;" and "[t]oo many 'old school' corporate management associates." Plaintiffs contend that because they were the two oldest senior vice presidents, the comments in the memorandum relate to them. However, Defendants point out that this memorandum was authored by a co-worker who was not involved in the decision to terminate Plaintiffs. "[A]ge-related comments by non-decisionmakers are not material in showing the . . . action was based on age discrimination."[48] Furthermore, the Court cannot conclude that these comments relate to age, but rather a way of thinking, and there is no evidence that this memorandum specifically relates to Plaintiffs.

In sum, these are isolated and ambiguous comments that do not appear to be related to Plaintiffs' age or terminations. Plaintiffs have presented insufficient evidence to demonstrate pretext or an inference of discrimination on the basis of their age. Accordingly, Defendant is entitled

---

[46]*Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006).

[47]One comment was also made to Mapp, after his termination, by Charlie Bogan , legal counsel for the company. Bogan asked Mapp how the job search was going and then said "it can be very difficult for someone of your age." However, this comment was *after* Mapp's termination and made by an individual who was approximately eleven years *older* than Mapp. As such, it has no nexus to Plaintiffs' terminations.

[48]*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).

to summary judgment on Plaintiffs' age discrimination claims.

### B.    *Breach of Contract Claim*

Plaintiffs contend that Defendant breached their respective employment agreements by failing to pay them their expenses related to the real estate commission and closing costs on the sale of their residences in Atlanta, Georgia and Phoenix, Arizona.[49]

Defendant paid Plaintiff Sturdivant $32,599.33 for moving expenses incurred between February 2006 and August 2007.  Sturdivant had not sold his residence in Atlanta, Georgia on the date he was terminated by Defendant.  As of February 19, 2010, Sturdivant had not incurred any real estate commission or closing costs as a result of the sale of his residence in Atlanta.

Defendant paid Plaintiff Mapp $20,858.82 for moving expenses incurred between July 2007 and October 2007.  Mapp had not sold his residence in Phoenix, Arizona on the date he was terminated.  He sold his Phoenix residence in August 2009.

"Under Kansas law, construction of a written contract is a matter of law for the Court."[50] "The primary rule for interpreting written contracts is to ascertain the parties' intent."[51]  "Where a contract is complete and unambiguous on its face, the Court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence."[52]

---

[49]The Court notes that although both Plaintiffs argue that they are entitled to reimbursement for real estate commissions and closing costs, only Plaintiff Mapp's Employment Agreement references both items.  Plaintiff Sturdivant's contract only provides for real estate commissions.

[50]*Befort v. Kansas*, 2009 WL 1379377, at *3 (D. Kan. May 18, 2009) (citing *Wagnon v. Slawson Exploration Co. Inc.*, 255 Kan. 500, 511, 874 P.2d 659 (1994)).
     Both parties proceed under Kansas law, and the Court notes that the Employment Agreement contains a provision that the agreement will be governed and construed in accordance with Kansas law.

[51]*Carrothers Constr. Co., L.L.C. v. City of S. Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009).

[52]*Befort*, 2009 WL 1379377, at *3 (citing *Simon v. Nat'l Farmers Org.*, 250 Kan. 676, 679-80, 829 P.2d 884 (1992)).

Whether an instrument is ambiguous is also a question of law for the Court.[53]  "Ambiguity in a contract does not appear until two or more meanings can be construed from the contract provisions."[54]  "When a contract is not ambiguous, the Court may not rewrite a contract to achieve an equitable result under the guise of contract construction."[55]

The parties agree that Section 5(c)(2) of the Employment Agreement is applicable.  Section 5(c)(2) provides that in the event of a termination without cause, for good reason, or for the company's failure to extend the term of employment, the company shall pay the following: "(iii) all Earned Obligations in a lump sum within thirty (30) days after the date of Termination of Employment . . . ."

The parties disagree, however, as to the interpretation of "Earned Obligations."  Section 1 of the Employment Agreement defines "Earned Obligations."  It provides:

> "Earned Obligations" shall mean, as of the date of Termination of Employment, the sum of (A) the Employee's aggregate Base Salary through such date to the extent not theretofore paid, <u>plus</u> (B) all vacation pay, expense reimbursements and other cash entitlements earned by the Employee hereunder as of such date to the extent not theretofore paid, <u>plus</u> (C) the Deferred Compensation and Severance payments required pursuant to Section 3(b) and 3(c) hereof."

Section 3(c)(4) in Sturdivant's Employment Agreement provides:

> <u>Moving Expense Reimbursement.</u>  The Company will reimburse the Employee for his actual expenses not to exceed Seventy-Five Thousand Dollars ($75,000.00) incurred by Employee for (i) any real estate commission paid by the Employee in the sale of his residence in Atlanta, Georgia, . . . .

Section 3(c)(4) in Mapp's Employment Agreement provides:

---

[53] *Id.* at *4 (citing *Simon*, 250 Kan. at 680, 829 P.2d 884).

[54] *Carrothers*, 228 Kan. at 751, 207 P.2d at 239.

[55] *Befort*, 2009 WL 1379377, at *4 (citing *Quenzer v. Quenzer*, 255 Kan. 83, 85, 587 P.2d 880 (1978) and *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987)).

> Expense Reimbursement.  The Company will reimburse the Employee for his actual
> expenses not to exceed Fifty Thousand Dollars ($50,000.00) incurred by Employee
> for any real estate commission and closing costs paid by the Employee in the sale of
> his residence in Phoenix, Arizona. . . . .

Defendant contends that the straightforward language of the contract limits expense reimbursements to those actually incurred by the employee as of the date of termination of employment.  Because neither Plaintiff had incurred any closing costs on the sale of their residences as of the date of their terminations, Defendant asserts Plaintiffs are not entitled to reimbursement.

Plaintiffs assert that the plain reading of the Earned Obligations provision has no requirement that the real estate commission must have been "earned" or accrued prior to Plaintiffs' terminations in order for them to be reimbursed.[56]  Plaintiffs argue that because Defendant does not acknowledge that the obligation extends past termination, it amounts to a breach of contract on Defendant's part.

The plain language of the Employment Agreement defines "Earned Obligations" to "mean, **as of the date of Termination of Employment**, the sum of . . . (B) all . . . expense reimbursements . . . **earned by the Employee hereunder as of such date** to the extent not theretofore paid . . . ."  Moving expense reimbursements are defined in Section 3(c)(4), and it provides that the company will reimburse the employee for his actual expenses, not to exceed a certain amount, for any real estate commission [and closing cost] paid by the Employee in the sale of his residence . . . .  As such, the provisions limit any expense reimbursements to those actually earned, or incurred, by the employee as of the date of termination of employment.  Because Plaintiffs had not earned, or incurred, any real estate commission in the sale of their residences as of the date of their termination, they are not

---

[56]Generally, Plaintiffs contend that Section 1(C) has no reference to a date and only references Section 3(b) and 3(c) of the Agreement.  Because their Moving Expense Reimbursement or Expense Reimbursement is located at Section 3(c)(4), Plaintiffs contend that this means that there is no requirement to that the real estate commission must have been "earned" prior to their terminations.

entitled to reimbursement of real estate commissions.[57]  As such,  Defendant is entitled to summary judgment on Plaintiffs' breach of contract claims.

**IT IS ACCORDINGLY ORDERED** that Defendant Duckwall-Alco's Motion for Summary Judgment (Doc. 36) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 23rd day of November, 2010.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[57]With respect to Plaintiff Sturdivant, as of February 2010, approximately two years after his termination, he had not sold his residence and therefore, he still had not paid any real estate commission on the sale.

As Defendant points out, following Plaintiffs' line of reasoning, Defendant would conceivably be required to pay Plaintiffs a real estate commission in the year 2020 if Plaintiffs do not sell their residences until that date.  This does not comport with the plain language in the Employment Agreement referencing Earned Obligations, as of the date of Termination of Employment, and expense reimbursements earned as of the date of termination.  In addition, Section 5(c)(2)  requires all Earned Obligations to be paid in a lump sum within thirty days after the date of termination of employment.  Requiring the payment of a real estate commission as an "earned obligation" several years, instead of thirty days after termination, does not comport with the contract's plain language.